IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA

CAROL L. WILLIAMS,
    Plaintiff,

v.                                       Case No: 3:08cv557/RV/MD

MICHAEL J. ASTRUE,
Commissioner of Social Security,
    Defendant.
_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Carol Williams' applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

## PROCEDURAL HISTORY

On August 29, 2004 the plaintiff, Carol Williams, filed an application for disability benefits claiming an onset date of January 1, 2000. The application was

denied initially and upon reconsideration and the plaintiff requested a hearing before an Administrative Law Judge (ALJ). A hearing was held on October 22, 2007 at which Ms. Williams was represented by counsel and testified. A vocational expert also testified. On November 7, 2007 the ALJ rendered an unfavorable decision (Tr. 16-40), in which he noted that a prior application had been denied at the initial level, and that the denial had not been appealed, making the earlier determination final as of October 30, 2003. Ms. Williams requested review by the Appeals Council and submitted additional evidence. The Appeals Council considered the new evidence but declined review (tr. 7-10). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Ms. Williams met the insured status requirements through June 30, 2005 (meaning that for disability insurance benefits, she must prove that she was disabled on or before that date); that she had severe conditions of multi-level degenerative disc disease of the lumbar spine, status post lumbar discectomy, multi-level degenerative disc disease of the cervical spine, herniated C5-6 disc, major depression without psychotic features, generalized anxiety disorder, and panic disorder with agoraphobia, but that she did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C. F. R. Part 404, Subpart P; that she had the residual functional capacity to do medium work with some restrictions; that she could not do her prior relevant work as a child day care center worker; that she was 42 years old at the time of the decision with a high school equivalent GED; that jobs

existed in significant numbers in the national economy that she could perform; and that she was not under a disability as defined in the Act.

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence. *Falge, supra*. The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). Findings of fact by the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps. A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

Because the undersigned concludes that this case should be remanded on a specific and possibly dispositive issue, the following summary will be limited to

medical and mental conditions and treatment relevant to that issue.[1] The specific issue discussed here, which involves the first and second grounds for reversal raised by Ms. Williams, concerns her mental capacity.

Ms. Williams has a long history of physical problems which the ALJ found to be severe, and which need not be outlined here. Because she also had mental problems, Ms. Williams was seen by Steve Hirschorn, Ph.D. on August 28, 2003 at the request of the state agency. She told him that she had suffered from panic attacks for five years, particularly over the last two and half. She said that doctors had told her that while she was giving birth to her son, they had lost her and her son for six minutes.[2] Since that time her panic attacks occurred three to four times per day and during these times she felt completely overwhelmed. She described an abusive upbringing, including depression in her teens and an attempt at suicide by overdosing. She admitted use of marijuana in the past, but not consistently, and denied use of alcohol or drugs. Her social history included mention of molestation by her father at age 14. She was a loner at school, quit school after the tenth grade and got married at age 17. Dr. Hirschorn's mental status examination noted impaired remote memory and with minimal insight. Her affect was flat and she teared frequently because she felt that her life was out of control. Dr. Hirschorn diagnosed

---

[1] If the district judge rejects the recommendation as to this issue, the matter should be referred back to the undersigned for consideration of the other issues raised by the plaintiff.

[2] This is one of several instances that cause claimant's reliability as a historian to be called into question due to inconsistencies in what was apparently reported to treating or examining professionals. She also reported that she and her son were lost for three, three and a half or four, minutes, or omitted mentioning this at all during an ER visit three months after her son's birth, and to a physician conducting a review for the Office of Disability Determinations (tr. 350, 551, 275, 297). Other areas of inconsistent presentation include claimant's substance use/abuse, her history of sexual abuse, her work history and even her personal information. For instance her height is reported as 65", 66", five foot eight or five foot nine, and on at least one report she is described as a Black female although the overwhelming majority of record references indicate that she is blonde, blue-eyed and caucasian (tr. 362, 413, 487, 495; 411).

major depression, recurrent, without psychiatric features, panic disorder and agoraphobia and assigned a Global Assessment of Functioning ("GAF") score of 45.[3] He concluded that Ms. Williams could not work productively at that time (tr. 309-12).

On April 22, 2004 Ms. Williams was examined by Generoso P. Masangkay, M.D, a psychiatrist. Her history was generally consistent with that given to Dr. Hirschorn. Ms. Williams appeared moderately depressed and anxious but was not agitated or irritable. Her attention span was adequate but her concentration was poor at times. She had been taking Prozac, Zyprexa, Xanax, Buspar and Restoril, although she had run out of the Prozac and Zyprexa two weeks prior. Dr. Masangkay diagnosed major depressive disorder without psychotic features, dysthymic disorder, post traumatic stress disorder and generalized anxiety disorder, with a GAF of 45-50. He recommended antidepressant therapy with Effexor and Klonopin and to discontinue Xanax, Buspar and Restoril (tr. 350-52).

Ms. Williams was next examined by Bruce Borkowsky, Psy.D. on July 22, 2004. Dr. Borkowsky noted that Ms. Williams' abstract thinking was fair to poor, concentration and persistence were fair, recent memory, impulse central and judgment were good, affect anxious, fund of information was fair and insight was poor. Dr. Borkowsky diagnosed a personality disorder NOS with self-defeating features. He recommended psychotherapy and noted good ability to understand, and

---

[3] A GAF between 41-50 is indicative of "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed., Text Revision (2000) at 34. As stated in the ALJ's opinion in this case, GAF scores are not an assessment of a claimant's ability to work, and neither the Social Security Regulations nor the case law require an ALJ to determine the extent of an individual's disability based entirely on the person's GAF score (tr. 33 citing 65 Fed.Reg. 50764-65 (Aug. 21 2000); *Newsome v. Barnhart*, 444 F.Supp. 2d 1195 (M.D. Al. 2006)).

a fair ability to respond appropriately to supervision, coworkers and work pressures (tr. 357-59).

Ms. Williams sought treatment for panic attacks at Hendry-Glades Mental Health Clinic in November 2004. Her speech was pressured, exhibiting symptoms of shaking and difficulty speaking. Dr. Pait diagnosed major depression with psychotic features, anxiety disorder severe, borderline personality disorder severe, borderline personality disorder with histrionic features and a GAF of 45. Dr. Pait added Trazadone and discontinued Resperdal. Ms. Williams admitted to marijuana use six months prior. She claimed to have suffered head trauma six months before during a boating accident. In February 2005 Dr. Pait opined that Ms. Williams was unable to work based on inability to do work-related mental activities involving understanding or memory, sustained concentration and persistence, or social interaction (tr. 401-405).

On June 23, 2005 Ms. Williams was examined by Gary Weinberger, Psy.D. at the request of the state agency. He noted a history and background that included her residing with a friend, her work history, medication regimen, never having a head injury, no substance or alcohol abuse, inability to manage finances, feelings of sadness and uselessness, and an absence of a legal history. Dr. Weinberger stated that sufficient rapport was developed and that all data may be considered valid. He administered the Rey 15 Items Task[4] test and noted findings that her short term memory was intact, although poor, her attention and concentration were poor, her

---

[4]The court could not locate a description of the "Rey 15 Items Task" cited by Dr. Weinberger. However, the Rey 15-item Memory test is used to evaluate potential for malingering in memory. See www.braninsource.com/nptests.htm. And, the Rey 15-item Memory Test II is a revised version of the original Rey Memory Test and is used as a measure of test-taking effort. See www.informaworld.com/smpp/content~content=a905789898~db=all~order=page. The reliability of this test has been challenged. See Otfried Spreem & Esther Strauss, A Compendium of Neuropsychological Tests, Administration Norms and Commentary, 2nd edition, Administration MS and Commentary, 675 (2d. 1998).

*Case No: 3:08cv557/RV/MD*

ability to perform simple calculations was poor and that she would likely not be capable to manage her own finances. Dr. Weinberger found Ms. Williams' capacity for abstract reasoning within normal limits and social cognition poor. He found her to have placed a full amount of effort into completing the evaluation. He diagnosed adjustment disorder with anxiety and depressed mood and a GAF of 63[5] (tr. 418-19).

On June 20, 2007 Ms. Williams was examined by Richard Doll, Ph.D, a psychologist, again at the request of the state agency. He administered the Wide Range Achievement Test (WRAT 4) and the Wechsler Adult Intelligence Scale - Third Edition (WAIS III). Her scores on the WAIS-III showed an IQ of 70 (verbal), 68 (performance) and 66 (full scale). Dr. Doll noted that Ms. Williams' "level of persistence, concentration, and motivation warrant these scores to be considered valid." (Tr. 488). Ms. Williams gave a history of a traumatic back injury and seizures, denied a history of learning disability, behavioral problems or enrollment in special education, and said she completed the ninth grade. She admitted to substance abuse with pain medication and provided her current psychotropic medication regimen. Dr. Doll performed a mental status examination, noted her activities of daily living, and opined that her functional ability was mildly impaired in persistence and pace of daily activities and that she was able to tolerate the demands of work and concentrate sufficiently to complete tasks. Dr. Doll diagnosed panic attacks (by history), major depression without psychotic features (by history), personality disorder, borderline, with psychotic features (by history) and mild mental retardation. Dr. Doll opined that Ms. Williams' ability to do work-related activities with respect to understanding and remembering was fair, sustained concentration was fair, and adaptation and ability to tolerate stress in the work environment was

---

[5] A GAF of 61-70 is reflects "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Diagnostic and Statistical Manual of Mental Disorders*, 4th ed., Text Revision (2000) at 34.

guarded. He also opined that she had no ability to interact with the public, moderate limitation in ability to interact appropriately with supervisors and co-workers and mild limitation in ability to respond appropriately to usual work situations and to changes in a routine setting. Dr. Doll also opined that Ms. Williams did not have an impairment that included alcohol or substance abuse (tr. 486-490).

Ms. Williams was admitted to the hospital for acute psychosis in August 16, 2007, disoriented, confused, agitated, and unresponsive. She was discharged August 21, 2007 with a diagnosis of depressive disorder, history of alcohol, cocaine, marijuana abuse in remission 7/8 years and with a GAF of 50.[6] A urine screen was negative for illicit drugs (tr. 510-25).

Ms. Williams was also seen at the Lakeview Center by a psychiatrist, Dr. Montes beginning in February, 2007. She reported that she functioned pretty well until her pregnancy, but said that when she received an epidural injection both she and her baby died for three and a half minutes. She reported that since then she had blackouts, seizures, and panic attacks. She admitted frequent anxiety and depression. Dr. Montes took a substance abuse and legal history and performed a mental status examination. He noted constricted and blunted affect, teary eyes throughout the interview and depressed mood. Thought process was blocking but logical, and she was alert and oriented and competent to consent for her own treatment. Dr. Montes diagnosed a generalized anxiety disorder, with panic attacks, depressive disorder, and probable post traumatic stress disorder with a GAF of 40.[7]

---

[6] A GAF of 41-50 reflects "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

[7] A GAF of 40 reflects "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgement, thinking or mood (e.g., depressed person avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

*Case No: 3:08cv557/RV/MD*

He provided a medication regimen and explained expected side effects. Ms. Williams was seen by Dr. Montes and Dr. Rosecrans through August 2007 with no change in diagnosis, with medication adjustment and no change in GAF (tr. 544-52). Dr. Montes completed a questionnaire as to both the four "B" criteria under the listing of mental impairments and work-related functional activities and found her moderately impaired in most work-related areas, and felt she would frequently have deficiencies in concentration, persistence, or pace (tr. 484-85).

## DISCUSSION

The plaintiff argues that, among other grounds for reversal, the ALJ erred in failing to find her disabled under the Commissioner's standard for mental retardation. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of her physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

### Mental Retardation under Listing 12.05c.

Plaintiff argues that the ALJ erred in not finding that she was presumptively disabled under 20 C.F.R. Pt. 404, subpt. P., App. 1, § 12.05C. The regulations promulgated by the Commissioner at Appendix 1, Subpart P, set out specific physical and mental conditions that are presumptively disabling (listings). If a claimant meets the requirements of one of the listings, no further proof of disability is required. *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Plaintiff claims that she has met the requirements of listing 12.05C:

> **12.05  *Mental Retardation*:**  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>     The required level of severity for this disorder is met when the requirements in A. B. C. or D. are satisfied.
>
> * * *
>
> **C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.**

The ALJ here refused to find that plaintiff was disabled based on her full scale 66 IQ score, and gave the following reasons:  (1) other examining psychologists, including Dr. Doll, estimated that Ms. Williams' level of intellectual functioning was between borderline and average; (2) the low scores "could be" a function of her mental health symptomatology exacerbated by drug and/or alcohol use or poor effort on her part, (3) Ms. Williams had a history of semi-skilled work, and (4) there were no deficits in adaptive functioning (tr. 33).

The ALJ's determination is unsupported.  First, the fact that other mental health professionals estimated Ms. Williams' intelligence is meaningless in light of her test score.  Dr. Doll estimated that her intellectual functioning was in the average range before he administered the test (tr. 487).  However, he specifically noted that in his opinion "[t]he claimant's level of persistence, concentration, and motivation warrant these scores to be considered valid."  (Tr. 488).

Second, to say that the low scores "could be" the result of other factors is pure speculation and is completely contrary to Dr. Doll's professional opinion.  An ALJ "may not arbitrarily substitute his own hunch or intuition for the diagnosis of

a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992) (Johnson, J., concurring). That is exactly what the ALJ did here.

Third, the ALJ determined that Ms. Williams' IQ score should not be given credence because her prior relevant work as a child daycare center worker was semi-skilled according to the testifying vocational expert (tr. 651). According to the *Dictionary of Occupational Titles*, published by the United States Department of Labor, a "Nursery School Attendant," with alternate titles of "Child-Care Leader," Child-Day-Care Center Worker," or "Day Care Worker" is semi-skilled, and requires, among other things, that the person must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form[;] [a]dd, subtract, multiply, and divide all units of measure" with common and decimal fractions and compute ratio, rate and percent; "[r]ead a variety of novels, magazines, atlases and encyclopedias[;] "[w]rite reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech[;] and "[s]peak before an audience with poise, voice control, and confidence, using correct English and a well-modulated voice." DICOT 359.677-018. However, that is not the job Ms. Williams described. At the hearing she indicated that she had a GED but had never received vocational training (tr. 644). In a Disability Report Ms. Williams wrote that she was a "Pre K Teacher[.]" She described her job as "Taking Care of 3 & 4 yr. old kids Playing, Exercise Jumping, running, pick them up, stood a lot (sic)." (Tr. 110). In a Work History Report Ms. Williams wrote that "I lifted Children from Infants to 12 yrs. Children I carried from across the room I was not hurt yet." (Tr. 173). She described her job as "taking Care and playing with children all day." (Tr. 174). She further wrote "I lifted Carried Jumped Danced. Crawl around on the floor and I loved it. I wasn't hurt yet." (*Id.*).

Social Security Ruling 82-61[8] provides that a claimant will be found not disabled when she cannot do either (1) her prior relevant work as it was actually done" or (2) the job as described in the *DOT* (Dictionary of Occupational Titles). While this ruling does not address the issue directly, it indicates that the Commissioner considers a person's prior relevant work either as it was actually performed or as it is defined in the *DOT*. Thus, there is a tacit recognition that the claimant's actual job duties may differ from the DOT description.

As is made clear by Ms. Williams' description of her job duties, she was not doing semi-skilled work. See *Brown v. Astrue* 2009 WL 64117, *6 (N.D.Tex.,2009) (claimant is "presumably a reliable source of the facts regarding the requirements of her past work.)[9] Nowhere did she say that she did math, prepared reports "with proper format, punctuation, spelling, and grammar, using all parts of speech" or made oral presentations using correct English. The evidence in her written description of her job, and her use of English at the hearing would appear to contradict such an assertion, had one been made. The ALJ did not ask her what she did on the job, so the only evidence of her job duties came from her own reports that

---

[8] This document is available at 1982 WL 31387.

[9] The DOT is considered to be the "best source for how a job is generally performed." *Carmickle v. Comm'r*, SSA, 533 F.3d 1155, 1166 (9th Cir. 2008) (quoting *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001)). "The DOT creates a rebuttable presumption as to the job classification." *Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008). To deviate from the DOT classification, an ALJ "may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." *Tommasetti,* 533 F.3d at 1042 (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995)). A claimant can "overcome the presumption that the Dictionary's entry for a given job title applies to him by demonstrating that the duties in his particular line of work were not those envisaged by the drafters of the category." *Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045 1051-1052 (10th Cir. 1993) (quoting *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir.1986)(citing *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983))). Conversely, it would be logical that a claimant's duties at a particular job were less stringent than those contemplated by the DOT. The ALJ may make findings of fact that support a deviation from the DOT. *Johnson v. Shalala*, 60 F.3d 1428, 1435 n. 7 (9th Cir. 1995).

she essentially played with children.[10] The ALJ's determination that Ms. Williams' past performance of semi-skilled work invalidated the IQ score was not supported by substantial record evidence.

Additionally, the conclusion that claimant's history does not show deficits in adaptive functioning is also unsupported by the record. Ms. Williams' consistently low GAF scores, while not dispositive of the question of whether she can work, suggest deficits in her adaptive functioning, as do the records of some of the treating or examining mental health professionals.

Finally, the remaining factors noted by the ALJ are entirely consistent with an IQ of 66  The DSM-IV-TR describes a person in the "IQ level 50-55 through approximately 70" as follows:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

---

[10]In describing her positions as a daycare worker or a pre-K and kindergarten teacher, claimant stated that she supervised two people and was a lead worker, and that she spent approximately one hour doing so (tr. 172-174). After she was injured, she no longer reported being a lead worker (tr. 175). The accuracy of claimant's reporting is uncertain as eight jobs are listed on the work history report, but plaintiff provided information about only six of them (tr. 170-176).

DSM-IV-TR, p. 43.  Nothing cited by the ALJ is in conflict with this description of a mildly mentally retarded person, and this adds support to a finding that the IQ score of 66 was valid.

Ms. Williams' other prior relevant work was doing cleaning work for 7 months in 2000 and just over a month in 2002 (tr. 170, 176-177).  Work of this nature does not require great mental acumen,[11] and the fact that Ms. Williams worked, which the ALJ emphasized, is by itself barely relevant.  In *Ambers v. Heckler*, 736 F.2d 1467 (11th Cir. 1984), the court considered a comparable situation, and held that a claimant met listing 12.05C with an appropriate IQ score and a physical impairment, even though she had worked as a domestic, a babysitter, a waitress, and a laborer.  See also *Powell v. Powell*, 773 F.2d 1572 (11th Cir. 1972) (holding that just because a mentally disabled person was *once* able to work does not mean that disability is foreclosed when a mental or physical impairment later prevents working).  Thus, a mildly mentally retarded person can "achieve social and vocational skills adequate for minimum self-support," but later become disabled under Listing 12.05C when she develops a physical impairment that "has more than 'minimal effect' on the [her] ability to perform basic work activities."  *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (quoting *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985).

The Commissioner relies on *Popp v. Heckler*, 779 F.2d 1497 (11th Cir. 1986) to look beyond the claimant's raw IQ score as an aid in determining whether it is valid, but that case is easily distinguishable.  There the claimant had one IQ score of 69 (with others of 73 and 79), but had a two year associate's degree, held various clerking jobs, and taught middle-school algebra.  That degree of education and

---

[11] The *Dictionary of Occupational Titles*, published by the United States Department of Labor, lists job code 381.687-014 "Cleaner, Commercial or Institutional" as requiring level 1 development for reasoning, mathematics, and language.  This is the lowest level, and requires the ability to carry out "simple one- or two-step instructions," add and subtract two digit numbers, do some basic multiplication and division, change a dollar, recognize the meaning of 2,500 two- or three-syllable words, and speak and print simple sentences.

accomplishment is a far cry from what this case presents. Here the plaintiff's IQ score in a widely accepted assessment test was appropriately recorded by Dr. Doll and was believed to be valid. Ms. Williams worked at jobs that did not require more than minimal intelligence, and she was not shown to have engaged in any activity beyond what would be expected of a person who is mildly mentally retarded. The reasons given by the ALJ for rejecting the IQ score were not supported by substantial record evidence, and the court therefore concludes that the ALJ erred.

In order to meet the second part of the listing, the work disability requirement, plaintiff need show only that there is a minimal effect on her ability to work. Minimal means less than severe. "A claimant is disabled under § 12.05(C) of the Appendix when the combination of the impairments renders the claimant severely impaired; that is, disabled. Thus, the impairment referred to in § 12.05(C) is something less than "severe" as defined in § 404.1520(c)." *Edwards*, 755 F.2d at 1515. Whether Ms. Williams' physical limitations are at least minimal cannot seriously be contested. The ALJ found that she had severe conditions of multi-level degenerative disc disease of the lumbar spine, status post lumbar discectomy, multi-level degenerative disc disease of the cervical spine, herniated C5-6 discs, and that she could not perform her past relevant work. It is therefore clear that the record does not support a finding that plaintiff did not meet Listing 12.05C.

## CONCLUSION

This court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." Title 42 U.S.C. § 405(g). Remand is ordinarily appropriate for rehearing if the Commissioner failed to apply the law and regulations, or where the taking of additional evidence is necessary. When evidence has been fully developed and points unequivocally to a

specific finding, the court may enter the finding that the Commissioner should have made.  The court can reverse without remand where the Commissioner's decision is in plain disregard of the law and evidence.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *MacGregor, supra; Hale, supra*.  Moreover, the failure to apply the correct legal standard is grounds for reversal, not remand.  *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1983).

Here the evidence seems to point to a finding of disabled.  However, Ms. Williams was seen by multiple mental heath professionals and only one administered an IQ test.  Also, the facts concerning Ms. Williams' prior relevant work were not adequately developed.  This is particularly important given the claimant's questionable reliability as a historian.  This case should therefore be remanded.  The ALJ is required to fully develop the record, *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990); *Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).  The duty to develop the record exists even though the plaintiff is represented by a lawyer or paralegal.  *Brown*, 44 F.3d at 934 (citing *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir.Unit B July 1981)); *Smith*, 792 F.2d at 1551 (citing *Cowart*, 662 F.2d at 735).  This duty requires that the ALJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited," *Cowart*, 662 F.2d at 735 (citations omitted), and "investigate the facts and develop the arguments both for and against granting benefits." *Crawford & Company, supra*, 235 F.3d at 1304.  The ALJ did discredited the validity of the plaintiff's IQ score without giving adequate reasons.  That was error, as noted above.  In order for an informed decision to be made in this case, a current valid IQ score is necessary.  *See, Reeder v. Apfel*, 214 F.3d 984 (8th Cir. 2000) (holding that remand for IQ testing is required where ALJ failed to obtain appropriate test results after a psychologist

*Case No: 3:08cv557/RV/MD*

gave only an estimate of the claimant's IQ); *Gasaway v. Apfel*, 187 F.3d 840 (8th Cir. 1999) (holding that remand for IQ testing is appropriate where IQ scores, which otherwise met the requirements of Listing 12.05C, were 25 years old and could therefore not be presumed reliable).

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g), that the Commissioner be ordered to remand the matter for appropriate testing and for consideration of the plaintiff's claim consistent with this report and recommendation, and that the clerk be directed to close the file.

At Pensacola, Florida this 12th day of January, 2010.

/s/ *Miles Davis*
    **MILES DAVIS**
    **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636;** *United States v. Roberts*, **858 F.2d 698, 701 (11th Cir. 1988).**

Case No: 3:08cv557/RV/MD